IN THE UNITED STATES ~~COURTS OF APPEALS~~ DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA (ALEXANDRIA)
~~FOR THE FOURTH CIRCUIT~~

| | | |
|---|---|---|
| MUNEEB AKHTER, | ) | |
| Plaintiff-Appellee, | ) | COA. NO. 19-298 |
| v. | ) | |
| UNITED STATES OF AMERICA, | ) | 1:15-CR-124-TSE-1 |
| Defendant-Appellant | ) | |

§2255 MOTION

**Affidavit in Support of ~~§2244 Authorization motion~~**

I, Muneeb Akhter, under penalty of perjury, do swear the following statements are true and accurate.

## INTRODUCTION

I was employed as a Secure Operation Center (SOC) analyst with General Dynamics in June 2014, to contract with DHS HQ in St. Elizabeth Maryland. I met with DHS Agents Gershon "Gary" Ross and Christopher "Sean" Thrash on my second day of employment. Gary discussed my research, and offered a "top-secret" job opportunity and attempted to have me sign a document written by him, and was quickly escorted off the premises. I was terminated from employment a week after.

It was the following week when the Agents visited my residence in Springfield, Virginia, with three Secret Service Agents, to view my research to consider me for the "top-secret" job opportunity but I had purged my computers the week before due to a suspicion of their claims. They attempted to reassure me that their intentions were only to "recruit" me for the position. They mentioned that

a senior official was interested at viewing the research and would be available the following week.

I met with several lawyers to receive advice and hired Ash Dean from Gross & Romanick P.C. I then set an appointment to meet with Agent Gary at his DHS D.C. office. He led me to an interrogation room. I told him I was still interested in the meeting but would need four guarantees. I told him that there would be a lawyer present, the meeting would be recorded on video, the code would have a disclaimer "for research purposes only" and that I would not use the code, only instruct the agents on how to use it. He agreed and then inquired about a weapon that was lawfully registered to me.

The day before the meeting with the "senior official", I received a phone call from Washington Post crime reporter Justin Jouvenal about an expired state search warrant regarding my research. I realized the meeting was a hoax, and asked him to be present and bring the application of the warrant.

The agents arrived much before expected the day of the meeting in July 2014, and left before the lawyer and reporter were set to arrive. They executed a federal search warrant but I had cleared all devices the day before. I left them a message on the computer about their deceptive behavior.

The months between July 2014 and criminal complaint in February 2015, I would seemingly obtain several positions with companies but get rejected either

during the background check process or in the first week of employment. I

suspected the agents were contacting each company and informing them about

their investigation into my activity. This suspicion was later confirmed when I

reviewed footage in a proffer session that was obtained through one of the

company's security cameras.

I am certified under SANS GIAC and EC-Council in digital forensics

examinations. I attest the documents recovered from a Western Digital Passport

Hard-Drive returned by the FBI on January 2019, included evidence previously

thought to be lost.

1. Agent Gary's handwritten statement, written in my first-person. Never

   reviewed in case as it was used in a separate unexecuted state warrant

   that expired before the federal warrant.

2. A recording of the June 2014 meeting with Agent Gary and Sean as well

   as three Secret Service Agents (one named Jayson) at my grandmother's

   house where they try to view my research.

3. Agent Sean's affidavit for first search and seizure warrant includes

   everything that could be found on the darknet like child-pornography and

   terrorism related material justified by a false retelling of events (no

   mention of meeting at grandmother's house)

4. Several emails from my retired account showing the Agents had removed

my clearance from JPAS database and had warned companies and

businesses to disassociate from me.

I initially intended to have this information used in my defense but it was

destroyed by the custodian when my bond was revoked.

Respectfully Submitted,

Muneeb Akhter
2233 Everglade Court,
Carrollton, TX 75006

DISTRICT COURT

# IN THE UNITED STATES ~~COURTS OF APPEALS~~

FOR THE EASTERN DISTRICT OF VIRGINIA (ALEXANDRIA)
**~~FOR THE FOURTH CIRCUIT~~**

| | | |
|---|---|---|
| MUNEEB AKHTER, | ) | |
| Plaintiff-Appellee, | ) | COA. NO. _19-298_ |
| v. | ) | |
| UNITED STATES OF AMERICA, | ) | 1:15-CR-124-TSE-1 |
| Defendant-Appellant | ) | |

§2255 MOTION
## Affidavit in Support of ~~§2244 Authorization motion~~

I, Saabra Akhter, under penalty of perjury, do swear the following

statements are true and accurate.

## STATEMENT

In September 2017 I was cleared by the DHS to work for the agency's

component NPPD (the National Protection and Programs Directorate, currently

known as the Cybersecurity and Infrastructure Security Agency or CISA) through

a contract with OBXtek, Inc. at the agency's 1616 Ft. Myer location in Arlington,

Virginia. I began working at the site on October 11, 2017.

In May 2018 I was contacted on my office phone by DHS Agent Gershon

"Gary" Ross. Gary explained that, upon learning of my work appointment with the

DHS, he wanted me to meet him in his Washington, D.C. office over concerns

regarding my "level of contact with my brothers," who had been convicted of wire

fraud and conspiracy to access government data in 2015 – through an investigation

that was led by Gary. Upon being told by Gary that I was "not in trouble" and that

the meeting was voluntary, I declined to meet with him. When pressed for an

explanation, I cited my physical and legal distance from my brothers' criminal

activity and my prolonged lack of communication with my brothers since their

conviction and throughout their incarceration. I reiterated that if the meeting was

voluntary, I simply chose not to meet with him. I was then told by Gary that my

declining to meet with him constituted grounds for termination from my contract

position. I offered to answer any of his questions via phone or email, to which

Gary refused for reasons unknown to me.

In a following week, Gary visited my office location unannounced with a

female agent and was directed to my office space by the DHS program analyst who

oversaw the contract through which I was employed. Gary directed me to an

unoccupied office space onsite where I sat across the table from him and his

colleague. Upon showing his authorization for investigation he proceeded to play

an audio recording of an unexplained and unreferenced phone conversation

between my brothers that he obtained from electronics seized by the DHS raid on

my family's Springfield, Virginia residence. In the middle of the recording I asked

why I was being made to listen to this phone recording, unable to understand its

context and relevance to my job or my relationship with my brothers. Gary said he

wanted to make sure I was aware of my brothers' past behavior and that I was taking steps to secure identification and electronics issued to me by the DHS. I explained that I understood the security concern my brothers posed and reiterated my physical and legal distance from their criminal activity. Gary then confirmed with me that my residence at the time was not the same Springfield, Virginia residence that was raided multiple times by the DHS. I confirmed that my current residence at the time was separate from that of my brothers, that it was inaccessible to anyone but myself and the property personnel, and that my brothers had never seen, attempted to access, or even been aware of my DHS-issued identification or electronics.

I stated that I was not physically present during any of the raids on my family's Springfield, Virginia residence – information that Gary was well aware of due to his involvement in the raids. Gary nonchalantly quizzed me on my knowledge of the raids, asking me when they occurred, where I was during those times, which family members were present at each one, and if I knew the reasons for them. I confirmed that I was out of the country for travel during the first raid and resided out of state for my education during the subsequent raids. He then asked a series of personal questions involving my graduate education at the time and whether I planned to pursue a career with the DHS. I was terminated from my

contract position in June 2018 due to internal issues regarding my contract.

Because of the nature of his unannounced visit and his refusal to communicate

with me electronically, I have no direct evidence of being contacted and threatened

by Gary.

Respectfully Submitted,

7/24

Saabra Akhter
2300 Marsh Ln.
Carrollton, TX 75006